Your Honor, if I could, as a preliminary matter, I would like to reserve two minutes for rebuttal. Sure. Okay. My name is Thomas Hart and I am Special Counsel for the IBT Local863pensionfund. The questions that are presented to the Court by this appeal involve a provision of ERISA that sets out the formula and method for determining what the annual withdrawal liability is. Where did the District Court go wrong? I'm sorry, say again, Your Honor. Where did the District Court go wrong? It seems to me he did a pretty darn good job in figuring this out. Well, we fully agree with the Court's analysis with respect to the multiple contribution ratio. We do think, however, that it was an did not include a PPA-mandated increase in the contribution rate, and I'm prepared to discuss that now if you'd like. Maybe you could get into that. Sure, I'd be glad to, Your Honor. Of course, in doing that, I'm sure you'll deal with this, but what we're talking about primarily from your perspective is the arising under issue and whether or not 4212 comes into play given that the liability kicks out of 4219. But the Supreme Court has a footnote, footnote 11, in lightweight, I keep calling it lightweight, it's not lightweight. It's advanced lightweight concrete, as the matter of the case, yes. And that seems to me, now I understand the issue here was different, you can argue that it's dicta, but that seems pretty clearly to say that the arising under collective bargaining agreement, the two parts of the argument, one is whether it arises under the CBA or arises under labor management relations laws. We'll get to the CBA in a second. But after the second part of that, it seems pretty clear that the Court is saying what Congress intended insofar as arising under labor management relations law is the NRLA, not ERISA. And that, again, to argue Well, I'd be glad to address that, but let me first say that what the statute provides in section 4212A is that the meaning of obligation to contribute is an obligation that arises under one or more collective bargaining agreements or related agreements or both or a duty or as a result of a duty under an applicable labor management relations law. I want to first postulate that there is no statute, I've never run across and I've looked a lot for any law that defines the words labor management relations law. Now clearly the National Labor Relations Act is such a law, but the fact that the statute uses that phrase does not mean that anything else is precluded. Now let me go into the advanced lightweight case for a minute, because that case is really not at all involved here. What advanced lightweight involved, what was involved in advanced lightweight is a pension plan tried to enforce a contribution right that it claimed it had for a collective bargaining agreement that had expired. Under established NLRA law, and I do this sort of thing all the time, when a collective bargaining agreement has expired under its terms, you enforce contribution obligations only by going to the National Labor Relations Board. Now I understand though, that's why I said you could argue that footnote 11 is dictative because that really was not the issue, it was really a jurisdictional issue, whether it's a federal district court or the NRLB. I'm sorry Your Honor, but that footnote was really in the context of whether the National Labor Relations Act, whether the National Labor Relations Act is a labor management relations law, and it clearly was. It did not address the question of whether any other kind of law that affects employer-employee relationships is also a labor law. As I said, there is no... It's not exclusive. I think that's pretty clear. You're correct on that, but how do we define it? How far does it go? Is the Internal Revenue Code a labor management relations law? No, it is not. Only to the extent that it would affect the bargaining relationship, say, between the parties or employee-employer obligations. Section 401 entitled Qualified Pension, Profit Sharing, and Stock Bonus Plans, that's a fairly But Your Honor, the statute that we're dealing with here is ERISA, and while it is true the Internal Revenue Code may not, for most purposes, be considered a labor relations act, still ERISA itself is. What it does is the PPA specifically says that when a plan is deemed to be in critical status, contributing employers automatically are required to increase their contribution rate in the first year for 5% and the second year 10%. This is essentially a change in the collective bargaining obligations of the parties by fiat. Now, one other thing that the statute says, 4212A, is that it talks about the obligation to contribute is an obligation arising out of several things. First is one or more collective bargaining agreements. The second thing is a related agreement, that's in the statute as well, or as a result of a duty under applicable labor management relations law. Now, I've talked about the fact that I believe that this is clearly that kind of labor management relations law because it does affect what an employer has to contribute. It is not precluded from being a labor law because the Congress in 1980 used the term labor management relations law. Remember, Congress could have said an obligation under the National Labor Relations Act. It did not. It used a more generic phrase and I think that the reason for that is that Congress understood there could be other laws that would affect that kind of relationship and contributions pursuant to that would be considered a contribution obligation under the statute. Now, one of the other categories in this section 4212A is that if it's an obligation that arises under a related agreement, and here we have such an agreement. The trust agreement that governs the IBT Local 863 Pension Fund states that an employer who is participating in the plan is obligated to make all payments required by law. I would submit, Your Honor, that this is such a requirement by law and for this reason also we have an obligation that has arisen under section 4212A. Now, there's yet another reason why I think it's and has to be considered in the highest contribution rate and that is when you look at how the PPA was subsequently amended. Originally, the PPA provided that, and I'm going to read this if you'll forgive me, in what was then section 304B7A. What it said was that any surcharges shall be disregarded in determining an employer's withdrawal liability under section 4211. That's the general provision in ERISA that provides for imposition of withdrawal liability except for purposes of determining the unfunded vested benefits allocable to an employer. Now, remember the purpose of withdrawal liability is so that when an employer has terminated its relationship with a multi-employer plan, if there are still unfunded vested liabilities that are created by its workforce, it has an obligation to keep paying those within the meaning of the statute. The statute here originally again said that you disregard any surcharges with respect to withdrawal liability except for purposes of determining unfunded vested benefits. That's exactly what struck me when I read it. It seems to me it was a strong argument, but their counter to that I believe is that if the obligation is not part of the obligation that arises under 4212, there'd be no need to accept it out in the language of 4219. Now, what's wrong with that return to DRD? Well, let me rephrase this if I can. When the worker retiree employer, and I can never remember what the R stands for, act, which is known as WERA, which was passed in 2008, it changed the law. What it did was the language that I just read to you about not considering surcharges in connection with withdrawal liability except for determining the allocation of unfunded vested benefits, that was repealed. And in its place, WERA simply said that now you do not take into account a surcharge only in respect to the allocation of unfunded vested benefits. In other words, it was the opposite of what was provided originally in the PPA. Now, Congress just last month changed the law yet again, and while I realize that it's not dispositive. Congress did something last month? Oh, yes. Whether you agree with it is another matter, but they definitely did something. I'm delighted to hear this. Okay, as part of the Budget Act, there was a division of it called Division I, if I recall correctly, that was about 124 pages that made major changes to the Employee Retirement Income Security Act, and one of those changes, which we briefed in the supplemental brief that we submitted about a week ago, about 10 days ago actually. It, for the first time, changed the law, so now Section 405E7 specifically says that in determining what the highest contribution rate is under the formula in 4219C1Ci, you do not take into account the PPA. That also includes increases that result, say, from funding improvement plans or rehabilitation plans. That was never in the language before, and we think that's a fairly clear indication that Congress had expected that before this law went into effect, it was to be included. Now, one other factor about the Multi-Employer Pension Reform Act, that's the law that was effective prospectively only, effective December 31st, 2014. If that law was to simply codify what Congress thought was the existing law, or otherwise make it, clarify it, there would have been no reason to make it prospective only. It would have been made retroactively. We suggest that this is Congress deciding to change the rules, and if it felt that the rules were correct in the first place, there would have been no reason or need for it to do so. I've exhausted my time prior to rebuttal, but I'm happy to answer any questions. You're both appellants here, and maybe you can take some extra time and address their argument on appeal. I'm sorry, Your Honor, I couldn't hear you. We didn't give you enough time. There are two appeals basically before us, but you're both, you're cross-appellants. Right. And maybe you can take some extra time and address their issue. You can address the 10 percentage here, but there's another issue here. Oh, sure. Averaging the contribution rates. Yes. Okay. What the ERISA provision that we're dealing with here provides is that the formula for calculating the annual payment of withdrawal liability that must be made by an employer following its withdrawal from a multi-employer defined benefit pension plan has two factors basically. The first is it requires a determination of the average number of contribution base units in the three-year consecutive period prior to the withdrawal. Is that just hours paid, CBU? Well, that's usually what it means. It could mean, for example, some kinds of collective bargaining agreements are paid by shifts, but the great bulk of collective bargaining agreements have hourly contribution rates and hourly pay rates. But that's why it doesn't say hours rates. It talks about contribution base units. So, as I said, the first factor is to determine what that amount is, the average number of contribution base units in a three-year consecutive period. That number is then multiplied by the second factor, which is the highest contribution rate at which the employer is obligated to contribute. What the withdrawn employer here is suggesting is that that language which we think and the district court agreed is absolutely clear and unequivocal actually means something other than what it says. It makes two arguments. First, it argues that, well, let me just one point to make before then. Another, when you look at the statute as a whole, it becomes even more apparent that this is the case if you're looking at section 4212A. It shows that Congress was well aware that there could be employers who withdrew who were subject to more than one collective bargaining agreement, and it also shows that Congress was aware that there could be collective bargaining agreements with more than one contribution rate. It shows the word's highest contribution rate. Congress could have used average if it wanted to do so. In fact, it did so in the first part of the formula when it talked about the average number of contribution base units. It could have said, well, there's a limit on the amount of the annual payment. It knew how to do that because it did put a limit on the total number of annual withdrawal liability payments that an employer is required to make. That's 20 years. So Congress knew how to do this. The fact that it didn't is, I think, dispositive here. You said the highest rate means the highest rate. Exactly. Now, it's a well-established principle of statutory interpretation, and if you will forgive me, I'm just going to quote a decision of this third circuit which I ran across in researching as I was looking at some of your earlier decisions. My brief cites a number of cases for the principle that when a court sees a statute that is clear and not susceptible to other interpretations, that's the end of the argument. You don't go any further, and, in fact, this court in a couple of instances, one of them being BG Construction Industries against the Director of Workers' Compensation and another one, In Re Harvard Industries versus IRS, which was actually authored by Judge McKee. Oh, sorry, yes, Judge McKee. I beg your pardon? When I was rehearsing, I wasn't sure who would be right in front of me, and he was not. But it makes it clear that that's it. What the withdrawn employer here is saying is that when you look at the legislative history, it somehow becomes clear that what Congress expected to occur is something different than what it actually said. This principle of statutory interpretation means that once the court has decided that this is clear and unequivocal, that's it. You don't look behind for supposed meaning of Congress that is something different than the words that it actually used. One other argument that they have made is that although the Pension Benefit Guarantee Corporation, which has the primary authority to administer the Title IV of ERISA, which deals with withdrawal liability, although that, they have never actually issued any regulation on the meeting of Section 4219C1CapC. But 24 years ago, they did write an opinion that the withdrawn employer here is arguing is somehow ought to be followed by this court. That's opinion letter 90-2. That opinion letter actually dealt with an entirely different issue. In that particular case, the Board of Trustees of the plan that was at issue had adopted an alternative withdrawal liability calculation figure for determining the employer's annual payment. Actually, it had the right under the statute to do that. Section 4214 of ERISA specifically allows it to do that. What the PBCC did in that opinion letter was simply say, yes, you have the right to do this, and pointed out that there was nothing in the method that they used that was inconsistent. Now, there is one interesting thing about this opinion letter, which I frankly only realized when I was looking it over again yesterday. The rule that the Board of Trustees in that fund had adopted, and I stress no similar rule has ever been adopted by the local 863 board, was that when you have an employer with multiple collective bargaining agreements, it would be acceptable to calculate the withdrawal liability annual payments separately for each contract and then add them. That was approved because the board had the authority under 4214 to do that. But there was one interesting thing in that opinion that, as I said, I just noticed yesterday. It did say that when you are using this method and looking at the contract by contract basis, you must use the highest rate under each contract. That's on page two of the opinion. I wish I could give you the exact site because I have it printed out from one of my legal reference services. But it does specifically say that the increase, when you do it, you must look at each individual contract, the highest rate. Lastly, again, there is nothing here anywhere in the statute, in any regulation, in any case law that would undermine the principle that highest contribution rate means exactly what it says. Thank you very much, Mr. Chairman. Thank you, Your Honor. Ms. Hall. Thank you, Mayor. Please, the Court. Matthew Hank, my colleague, is sitting at the council table. May I reserve two minutes for rebuttal given the fact that we have cross appeals? We're getting a tennis match when that happens. Why don't we just, again, be very generous with you and we'll let you pretty much tell us what you want to tell us and what you think is important for us to hear without getting into rebuttal because technically he could then ask to respond to your rebuttal. We're getting three rebuttals. Very good, Your Honor. The purpose of the Multi-Employer Plan Act withdrawal liability provisions was to eliminate the incentive for employers to withdraw and achieve this goal by requiring an employer to pay withdrawal liability in the form of annual payments in line with their previous contributions so as to make the liability an annual business cost. We are here today because the fund calculated the payments in a manner out of line with previous contributions and would force the payments to be almost 50 percent higher per year than Woodbridge's previous maximum annual contribution. That's if you get hit with the surcharge. Right. Including the surcharge and taking into account the multiple rates. Right. Let's assume $3.69 is correct and then adjust it up to $4.06. Right. What are the raw numbers we're talking about if you don't get hit with the surcharge? That would reduce the rate by about 9 percent. Can you give us the dollar value? I can. I didn't really notice that in either brief. As I understand it, your argument is that you would be in the soup for about $189 million, but then you'd have to pay $171 million, I think. Well, keep in mind that the unfunded vested benefit allocation is not actually the withdrawal liability. That's just one part of the calculation. The withdrawal liability is defined in 29 U.S.C. 1381 as the unfunded vested benefits adjusted by a whole bunch of reductions, one of which is the 20-year cap. Essentially what MEPA does is they create a payment schedule and an employer pays that payment for up to 20 years, less than 20 years if the employer would pay off the unfunded vested benefits sooner, otherwise it stops at 20 years. So if you want to think about what withdrawal liability is, it's the payment schedule. It's not the unfunded vested benefits. But going back to your question, $8.5 million is what the fund assessed. If you take off the surcharges, you get to about $7.8 million, which is still considerably above the $5.7 million that is the most Woodbridge ever contributed in any year. If you look at the rate-by-rate approach, you get down to about $7 million. If you take both off, we think you get down to a little over $6 million. All right, but you concede, wouldn't you, that $5.7 million can't be the right number? That's not even equitable because the deal that was struck by Congress is you get a 20-year cap. Yes. Well, no, we're talking about per year. No, but you only pay it for 20 years. So what really matters is, I mean, I don't know, call me too soft-hearted, but I'm having trouble with your argument from equity because when I look at this and I see $189 million owed, $171 million paid, I think, well, you're still a little short. Now, I'm not saying you're doing anything wrong by being short. All you're doing is theoretically following this program that Congress has established. But I guess I'm saying I'm not crying crocodile tears for the company if you're still coming up a little short. What am I missing there? There are a lot of ways to think about that $187 million. A lot of that existed when Woodbridge joined this plan 13 years before Woodbridge withdrew. They joined a plan that was already significantly underfunded. Woodbridge paid every penny in contributions that was asked of Woodbridge, which went partially to pay for all those contributions have to cover what's called the normal cost, which means the employees of Woodbridge got their benefits paid for out of Woodbridge's contributions, plus something to cover the unfunded liabilities. Those unfunded liabilities grew while Woodbridge was in the plan. And when Woodbridge withdrew, the plan could stop accruing benefits for Woodbridge's employees. So all of the $6 to $8.5 million a year goes only to pay off unfunded vested benefits. So if you want to look at it that way, the fund's better off having a withdrawn employer paying withdrawal liability than it is having an active employer pulling money out in the form of additional accrued benefits. So the equities sort of go both ways here. The real question is what did Congress intend? The real question is what does the law require? Yeah, and the law was a balancing between the goal of trying to get as much money into the plans as possible and the goal of allowing employers to continue. They didn't want to drive employers out of the system. So one of the purposes of all these various relief provisions is to make the withdrawal liability a business cost, something in line with the contributions the employer had previously negotiated. I do want to address a few of the things that Mr. Hart said because I think they're simply wrong. First is if you look at Title 29 of USC, there's a table of contents, and there are about 30 titles of the various sections of Title 29. Only one of them is called Labor Management Relations, the very term used in 4212. And what's in that section? The National Labor Relations Act and a couple of other statutes that affect and the Labor Management Relations Act and the Welfare Plan Reporting Act. So you're saying it's not exclusive to the LMRA? It's not exclusive to the LMRA, but it is. So he's right when he says they could have used the word act, but they used the word law, which broadens it a little bit. You're saying it's not broadened to cover everything that deals with labor management in the world? How do we know that? What gives us the interpretive clue to prove your point? There are a couple of things that get us that. Not only the Supreme Court opinion in Advanced Lightweight Concrete, but you're talking about laws that affect the bargaining relationship between union and employers. In addition to the National Labor Relations Act, you've got the Railway Labor Act that governs airlines and railroads, and you may have State Labor Relations Act that govern employers who are exempt from federal law, such as farm workers, public employees, and that sort of thing. So you may have a number of... The law in the nature of the NRLA as applied to particular industries or locations. Yes. You also have to remember the purpose of that language in 4212 is primarily to judge the timing of a withdrawal. An employer withdraws when the employer no longer has an obligation to contribute under either the National Labor Relations Act or another labor management relations law, or the collective bargaining agreement expires. Because, as in Advanced Lightweight Concrete, we know the employer continues after contract expiration, 4212 allows the timing of the withdrawal to be whenever that obligation under the law ends, even if the contract had previously expired. So these are the laws that govern the duration. PPA did not change that. There's nothing in PPA that affects the collective bargaining agreement or that requires the employer to change a collective bargaining agreement. The parties to the bargaining agreement can negotiate a contract that has zero contributions to withdraw. That was the Hohnerkamp case where the fund was arguing in that case, an employer in a critical status plan can't withdraw from a plan because you've got these required rehabilitation plan increases. And the court said, no, no, no. All the rehabilitation plan does is it sets up a number of schedules that cabin what an acceptable collective bargaining agreement is if the employer is going to continue to contribute. If the employer and union negotiate something different, the trustees have two options. They can change the rehabilitation plan to reflect what the parties bargained, or they can kick out the employer. But they cannot rewrite the contract. There's nothing in the PPA that allows them to rewrite the contract. In addition, the Internal Revenue Code includes all of the PPA provisions. There are parallel provisions. They're all in the Internal Revenue Code. And Mr. Hart concedes the Internal Revenue Code is not a labor law. It's certainly not a labor management relations law. It's also important to point out that in order to be included in the payment formula, it has to be a contribution rate. And only if it's part of the contribution rate do you then turn to is it part of the obligation to contribute. And it is the rate that's key, not the contribution. That's right. So it's got to be both. If the fund can't establish that's a surcharge as a contribution, it doesn't matter whether the PPA is an applicable labor management relations law. And they can't establish that they're contributions because the statute defines, says surcharges are to be treated as contributions for collection purposes and as contributions in determining what is to be a delinquent contribution. What they didn't, they emphasized contributions in their brief. They should have italicized the word as because it's the word as that's important. And they would have to read as out of the statute in order for the surcharges to be contributions. I do want to address. Before you move on that, what about Mr. Hart made an interesting point I hadn't thought about, which is this new amendment. Your argument, as I understand it, is just because the new amendment has explicitly stated your position doesn't mean that your position didn't obtain all along. That's right. And, you know, if I tell my teenagers next weekend not to drink beer at the party, that doesn't mean that I wanted them to drink beer at the party before I told them that. But he raises an interesting point about the effective date. What about that? Why would they have said it's effective beginning? Well, there's a good reason why Congress would not have gone retroactive. A number of employers may have been assessed payments based on surcharges and not contested it. Right? They made the payments. They let the 90 days for requesting review go by. Under then applicable law, that's final. There's no appeal. If Congress had made this section retroactive, would those employers have been able to come back and say, wait a minute, we're entitled to a refund because we made contributions based on what we thought was the law and now you've said the law has changed, give us money back. So they would have opened up a whole hornet's nest by making it retroactive. Also, everything in that law that was passed in December was prospective, even sections that simply restated prior law. The entire provision related to multi-employer plans was prospective only. And finally, they may just have decided, well, we'll let whatever cases are out there work their way through the system. We don't want to interfere with pending legislation. So those are, I think, three very good reasons why it was prospective only. And Sutherland in the Treatise on Statutory Interpretation says that if there is uncertainty as to what the law means, then a change in the law is deemed to be clarifying and not a change in substantive law. Only if it is accepted understanding of the law that everyone's unhappy with is a subsequent change deemed to be a change in substantive law. There's nothing in the legislative record that helps us in this case. I'm sorry. There's nothing in the legislative record that helps us on this point. There is nothing in the legislative history at all that helps us. There was even a complaint that there was nothing. There was even a complaint by one of the representatives that there was nothing in the record to help as well. In the WERA amendment that Mr. Hart relies so heavily on, it's our view that when it said withdrawal liability and that got amended to be unfunded vested benefits, that was to correct an erroneous statement in the prior. It was a technical correction because, in fact, withdrawal liability is defined in 1381 as unfunded vested benefits adjusted by all these other things. And only for purposes of unfunded vested benefits did the surcharges have to be excluded because that's the only way that referred to amounts rather than contributions. Because the contribution rate section 4219 says contributions and surcharges aren't contributions, they didn't need to amend that section. And also by excluding the attributable rule part of the UVB allocation from that exception, the effect was so that employers who paid surcharges in their attributable rule plan get the credit for the surcharge toward their unfunded vested benefits. So in effect, the amendment made sure that employers who paid surcharges weren't hurt by paying surcharges. That's the overarching reading of that little section of ERISA that affects the calculation of unfunded vested benefits. I briefly want to get to the multiple rate section. The fact is that Woodbridge every month counted up the contribution base units for eight different rate groups. And for each of those rate groups in February of 2011, they multiplied those contribution base units by the highest rate for each of those rate groups. And that's the check they wrote to the plan. Statute doesn't say rate groups, though. It says the highest contribution rate. You seem to pivot pretty quickly in your brief to legislative history, which frankly speaking for myself was, as legislative history often is, underwhelming. I didn't see anything dispositive. I don't know what happened. The statute doesn't help. Right. There is nothing. The better argument is the better argument, isn't it? It is stronger. That is certainly true. The legislative history, there are no examples in legislative history of multiple rates at the same time. There are only examples in legislative history of rates changing from one year to the next. And the only reference to the payment schedule is the reference to it being in line with the employer's previous level of contributions. Whatever that means. Well, I think we know what in line means. Well, I don't know. If I was a fund, I would think in line means a one-for-one contribution. What do we do with the text and what it says, the highest contribution rate? What do we do with that? We believe that if you, just as in 90-2, and by the way, 4214 doesn't clearly allow the rule that was adopted by the plan in opinion letter 90-2. 4214 simply says that any rule adopted by the plan under the statute has to be applied uniformly. So the plan asked the PBGC if highest rate was clear or if they could use this different approach to the term of highest rate, which is to look to the different contracts. In that case, each contract had only one rate. The PBGC said, yes, you're right. The statutory intent was to have the payment replicate or be similar to what the employer had previously been paying. The employer previously paid at three different rates for three different agreements, so you can look at the statute that way. In this case, the employer paid at eight different rate groups for different groups of employees. And that rate changed over time. You did that switch again. You put rate units in there as opposed to highest contribution rate. You put the highest rate unit in there. No, I'm saying the highest rate within each rate group, just like in 90-2, it was the highest rate within each collective bargaining agreement. In 90-2. The highest rate with all that universe of rates and differences, why wouldn't you just look at that universe and take the rate which was the highest and that becomes the rate under withdrawal liability? That's the exact question that the trust asked the PBGC in 90-2. And the PBGC said, no, you don't have to look at the one of the three that were paid simultaneously. You can look at all three. In our case, we have eight. Eight highest rates. The rates changed over time. They went up from one year to the next in each job classification and rate group. So the highest was the one in effect in February 2011 for each of those eight groups. Are you saying we owe deference to the PBGC in this regard? To the extent it is persuasive, yes. If it's not persuasive, then you don't. Is that Skidmore deference? I mean, it's not Chevron deference. It's Skidmore deference. I agree. I kind of sympathize with you here. You understand at least my concern in terms of what the text says, and you've kind of got to get around that. The Skidmore deference is one way to, I guess, undermine what the text of the statute is. But I sense you wish that you'd been left with a little stronger hand to play. I'm not asking you to respond to that. Yes. Thank you. Thank you, Your Honor. Thank you. Mr. Hart, we gave you a lot of time up front. And be mindful of what my first trial judge told me. When I asked him what I did with my closing argument, he told me the mind can only absorb what the seat can endure, and the key went way too long in your closing argument. And then I got that advice. I once appeared before a district judge who, in order to keep oral arguments down, said, I've made up my mind. Do you want to try to change it? I'm going to try to be very brief. Ms. Hoffman went through sort of a scattershot number of arguments, and I will try to just address some of the major ones that she made. The first one is that, again, what she is maintaining and what her client is maintaining is that somehow the legislative history can override the clear words that the statute used, pointed out its established law of interpretation of statutes, that you don't do that when you have a statute that's clear on its face as this one is. That's your argument on the rate, the contribution. That's correct. But why doesn't that come around to bite you on the surcharge? Because 1085E7B says that the surcharge is collected on the same schedule and enforced like a contribution, correct? Well, that's exactly the point I'm making, yes. But if the surcharge is part and parcel of a contribution, then that language I just read would be a nullity. It has a problem for you. I'm sorry. I'm not sure I follow you. If the surcharge is part and parcel of a contribution, then the statutory scheme wouldn't refer to it and say that we collect the surcharge on the same schedule as we collect a contribution. Well, the first one and the same. The first premise to the argument that you're making is that the second part of the statute, with respect to highest contribution rate, is clear and totally unequivocal. I can't tell you that it actually is. I think that it is the most reasonable interpretation of what is meant by the obligation to contribute, that it includes highest contribution rate. One of the arguments that I've made as to why that's a reasonable interpretation of what is meant by highest contribution rate, and remember the second part of the formula is you multiply the average number of contract bargaining units times the highest contribution rate. Well, where you have multiple contribution rates here, you pick the highest. And in this case, we've got a couple of reasons why the imposition of the surcharge, remember the surcharge is more than just a percentage. It means that, say, if your contribution rate is $1 and you're then subject to surcharge, then now your contribution rate becomes $1.10. There are two reasons why those are both obligations to contribute and therefore are part of the highest contribution rate. The first is that it is required by this related agreement, being the trust agreement, of the 863 pension fund, and there's lots of law, which we've cited, that says that an employer that contributes is obligated by the terms of the trust agreement of those plans, even though its collective bargaining agreements don't make express reference to it. But the second reason is that this is an obligation that's imposed by an applicable labor management relations law. Now, we've pointed out that the Congress was not limiting this to the NLRA. Everything else that, in fact, is in the subtitle of Title 29 that Ms. Hoffman was referring to doesn't really relate to, well, it may relate to the relationship between management and employees. It doesn't impose any specific obligations on anyone to contribute. Here we've got a statute that does impose an obligation on an employer to make additional contributions. And also, when you take a look at how the PPA has changed, it is clear that Congress has now twice changed its view as to how it's going to look at this. As I pointed out, the original PPA said that you didn't take into account surcharge for any purpose except for the purpose of allocating unfunded vested benefits. Then when WERA 2008 passed, Congress basically reversed that, saying then that you don't take into account surcharges for purposes of determining or allocating unfunded vested benefits, but then said nothing about whether it was to be taken into account in considering whether it was a highest contribution rate. Then, just last month, Congress changed its mind again and now stated, well, now we don't want it to be included for any purpose. In fact, prior to the Multi-Employer Pension Reform Act, there was no statement that increases that were required by employers that adopted a schedule or had a schedule imposed on them by a rehabilitation plan or funding improvement plan could be excluded from this. And now the statute says that you don't take into account in considering what the highest contribution rate is, a surcharge or any other contribution increase provided under the requirements of the Pension Protection Act. I think that it's not fair to say that the statute in this respect is absolutely clear and unwavering. I think that what is fair to say is that the reasonable interpretation of the statute, especially when you look at how contributions are treated elsewhere, 305E7 says that it is a contribution accepted that can be enforced like anything else, and then Section 304B also says that payments under withdrawal liability are also regarded as contributions. Now, in 4211, although those are regarded as contributions, they are excluded specifically. But anyway, the point I'm making here is that when you look at the statute as a whole, you look at it in the context of the entire ERISA scheme and you look at it in relationship to how Congress has changed the law since 2008, since 2006. I think it's clear that it's a reasonable interpretation that an increase in contributions required by the PPA is considered. And one last point. There is still a limitation. I'm so sorry, Your Honor. I'm sorry. When someone says one last point, I get concerned. I'm going to just take my books and go home, Your Honor.  Thank you. Thank you, Your Honor. Thank you, counsel, for a very, very knowledgeable attorney. I don't think I've had the pleasure of having either of you argue before me before, but hopefully you'll be back. Thank you very much. We'll take the matter under review. Thank you, Your Honor. Thank you.